UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JESSICA MARSILI,
          Plaintiff,

          v.

VILLAGE OF DILLONVALE,
OHIO, et al.,
          Defendants.

Case No. 2:12-CV-00741
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Terrence P. Kemp

## OPINION AND ORDER

Plaintiff Jessica Marsili brings this action against Defendants William A. Timko, III and the Village of Dillonvale, Ohio (Dillonvale or the Village) alleging constitutional violations under 42 U.S.C. § 1983. This matter is before the Court for consideration of six pending motions. For the reasons that follow, Plaintiff's motion for partial summary judgment, doc. 28, is **DENIED**; and Dillonvale's motion for summary judgment as to Plaintiff's claim for municipal liability, doc. 31, is **GRANTED**. The following motions are also **DENIED as moot**: the Village of Smithfield's motion for summary judgment on Plaintiff's *Monell* claim, doc. 32; Mr. Timko's simultaneous motion to strike and motion *in limine*, doc. 37; Dillonvale's motion to strike, doc. 41; and Mr. Timko's motion for judgment on the pleadings, doc. 43.

## I. BACKGROUND

### A. Factual Background

In the summer of 2010, Plaintiff and her husband, Christopher Marsili, lived in Dillonvale, a village in Jefferson County, Ohio. Doc. 26-1 at 8. Also at that time, William A. Timko, III, worked for two nearby police departments. He worked for the Smithfield Police Department from June of 2008 until October of 2011. Doc. 27-1 at 44–45. Starting in April of 2008, he worked as a police officer for Dillonvale, *id.* at 44, and he became Dillonvale Chief of

Police in September of 2009, *id.* at 45. The events underlying this dispute started with a police chase involving Mr. Marsili and ended with Mr. Timko's arrest of Plaintiff.

### 1. The Chase

On August 19, 2010, Mr. Marsili went to work in Cameron, West Virginia repaving blacktop on Route 250 for Ohio-West Virginia Excavating. He got off work at about 4:30 p.m. and, as he drove home, called his wife, Plaintiff, to check in. He asked her what she wanted to do that night; she said she wanted to go to the Jefferson County fair. Doc. 27-2 at 40. "She [then] said she was jumping in the shower," and he replied that "[he]'d be home in about 10 minutes." *Id.* He was heading north on Route 7 and eventually got off on the Dillonvale/Rayland exit, onto what Mr. Marsili believes was Old Route 7. *Id.* As he exited and drove "under the highway," he saw a white car sitting at a stop sign "like he had just got[ten] off of" the opposite side of the highway. *Id.* at 41. According to Mr. Marsili, the white car pulled out in front of him, and Mr. Marsili slammed on the breaks to avoid a collision.

With the white car now in front of him, Mr. Marsili trailed as they both headed on their way in the same direction. And, "next thing [Mr. Marsili] kn[e]w, [the white car] slammed on the brakes again," this time to make a sudden turn off of the road. *Id.* Mr. Marsili "flipped [the white car] off" and continued home. *Id.* According to Mr. Marsili, the white car waited for him to pass and then turned back out onto the road to follow. Mr. Marsili testified that the white car quickly came "flying . . . up behind" him and "started weaving back and forth." *Id.* He looked into his rearview mirror and noticed the other driver "shining something at the dash. I was like, Oh, my goodness, road rage." *Id.* Mr. Marsili said he proceeded home traveling the speed limit, *id.*, all the while the white car followed him between four and five miles "right on [his] bumper," *id.* at 48. As he came into Dillonvale, he saw "Dillonvale Police sitting at the bank" and he

"went right by them." *Id.* at 41. According to Mr. Marsili, the "white car stop[ped]" and "you could see his arm pointing." *Id.* Mr. Marsili soon saw the "Dillonvale PD and this guy flying up [the] road." *Id.* at 42. Mr. Marsili arrived at his house, ran inside, and closed the door.

It turns out that Michael Jenkins, chief of police in the nearby village of Rayland, drove the white car behind Mr. Marsili. *See* doc. 27-1 at 124. Neither party offers deposition or affidavit testimony from Officer Jenkins. But, according to several police offers present soon after the chase, Officer Jenkins got in touch with a number of nearby police officers to loop them into the situation. Those officers tell a slightly different story than Mr. Marsili.

As Mr. Marsili made his way home, Mr. Timko testified that he got a call from Officer Jenkins asking if Dillonvale had an officer on duty. Mr. Timko indicated that Officer Scott Christian was on duty at that time. *Id.* at 124–25. According to Mr. Timko, Officer Jenkins told him of "an incident and a vehicle traveling at a high rate of speed, driving erratically heading towards Dillonvale." *Id.* at 125. Officer Jenkins gave Mr. Timko a description of the vehicle and the license plate number, which Mr. Timko forwarded on to Officer Christian. *Id.* Officer Christian ran the plate and identified the owner as Mr. Marsili, someone whom Officer Christian knew. Doc. 26-3 at 17. After Mr. Timko told Officer Christian to look out for the car, *id.* at 16, Officer Christian set his car up "cattywampus so [he] could watch" cars come around the turn into town, *id.* at 20. Officer Christian's position was roughly a block and a half from Mr. Marsili's home. *See id.* at 21. Officer Christian testified that, based on Officer Jenkins' call, he turned his lights on when he saw Mr. Marsili—even though Mr. Marsili was traveling within the speed limit as he passed. *Id.* at 22. For his part, Mr. Marsili testified that he did not see Officer Christian's lights come on at any point on his way home. *See id.* Before Officer Christian could pull out to pursue, Officer Jenkins pulled up next to him—in the middle of the intersection—and

stopped. *See* doc. 26-3 at 22–24. According to Officer Christian, Officer Jenkins pointed toward Mr. Marsili's vehicle as it drove away. *See id.*

As Officer Christian turned his lights on, Officer Christian testified that Mr. Marsili "took off." *Id.* at 25. He also testified that he witnessed Mr. Marsili's vehicle go "left-to-center" four times in a one-block span and take a turn "so wide [that] it was clear into oncoming traffic." *Id.*; *see also id.* at 26 ("There was an oncoming car. It veered off, because he was so far in the left lane, it would have been a head-on collision."). As Officer Christian followed Mr. Marsili, he testified that Mr. Marsili made a "90-degree turn" onto 4th Street—where Mr. Marsili lives— before pulling into his driveway. *Id.* at 27. According to Officer Christian's testimony, Mr. Marsili pulled into his parking spot and, as his truck was still moving forward, "shoved [his car] into park" so abruptly that he "knocked him[self] down." *Id.* Mr. Marsili then ran into his house. He testified that he did not look back to see who followed out of fear that "[t]he guy in the white car was coming." Doc. 27-2 at 52. Officer Christian testified that Mr. Marsili was "flipping [him] off" "the whole time" Officer Christian followed him home. Doc. 26-3 at 27.

Officer Jenkins arrived right as Mr. Marsili made it into his house. He advised Officer Christian that Mr. Marsili had a concealed carry permit. *Id.* at 30. From there, all parties agree that Mr. Marsili opened a window in his house to talk with Officer Christian and Officer Jenkins. When he opened the window, Mr. Marsili recognized the men outside as Officers Jenkins and Christian. Officer Jenkins and Mr. Marsili knew each other prior to this encounter. According to Mr. Marsili's affidavit, a few weeks prior to August 19, 2010, Officer Jenkins pulled Mr. Marsili over and gave him a ticket for two infractions: traveling 27 m.p.h. in a 15 m.p.h. zone and running a stop sign. Doc. 28-1 at 13 (Ex. 10 ¶ 4). Mr. Marsili admitted the first charge, but

he denied the second and went to court to contest it. The judge sided with Mr. Marsili and dismissed the second charge "over the objection of Officer Jenkins." *Id.*[1]

The officers told Mr. Marsili to come out because he was under arrest. Mr. Marsili declined, profanely telling the officers that they were "crazy," that he "didn't do anything wrong," and that they should "[g]et out." Doc. 27-2 at 42. Mr. Marsili also testified that when he looked out of the window during the course of this encounter, Officer Christian had his gun drawn and aimed toward the house. *See id.* at 58–59. As the exchange ended, Mr. Marsili testified that he saw Officer Christian throw Officer Jenkins a shotgun, which Officer Jenkins pumped once before training on the house. *See id.* Officer Christian testified that he did give Officer Jenkins his shotgun. Doc. 26-3 at 35. He also testified that Mr. Marsili "kept running back and forth to the front window" and yelling profanity toward the officers. *Id.* at 36.

After exchanging words with the officers, Mr. Marsili said he turned back inside and yelled to Plaintiff, who was in the shower. He said, "They're out of their minds, Honey. Just go back in the shower." Doc. 27-2 at 62. He also "might have said something, you know, about a white car trying to wreck me, or something." *Id.* Plaintiff corroborates Mr. Marsili's deposition testimony. She testified that her husband told her that the police were trying to arrest him. She also said that her husband indicated who had been chasing her—"the cop that had been giving him a little bit of trouble." Doc. 26-1 at 34. She told him in response that she was going to

---

[1] According to Mr. Marsili's affidavit, roughly two weeks later Officer Jenkins also pulled over Mr. Marsili's daughter, Chailyn, who was visiting from Georgia at the time. Officer Jenkins cited her for going 50 m.p.h. in a 25 m.p.h., which Chailyn "said was not true." Doc. 28-1 at 14 (Ex. 10 ¶ 5). Chailyn also went to Court to contest the ticket, and the judge reduced the charge to going 30 m.p.h. in a 25 m.p.h. zone. The next day, Mr. Marsili states that he received a call from Chailyn's mother, his ex-wife, in Georgia, telling him

that a local Georg[ia] police officer had come to her door, and informed her that he had received a call from an Officer Jenkins in Ohio concerning Chailyn. She said that Officer Jenkins had made accusations of suspected drug use, and had stated that Chailyn was "being watched" while in Ohio.

*Id.* ¶ 6. Roughly a week later, Mr. Marsili and Officer Jenkins had their run in that preceded this case.

finish her shower.  After a quick exchange—between 10 and 15 seconds—he says he "turned around and left." *Id.* at 32.  Mr. Marsili exited from the back of the house, walked through a neighbor's yard, and hid inside of a nearby motor home parked on the street. *See* doc. 27-2 at 64–65.  He stayed there for 20 minutes but left once saw more police arrive at his house. *See id.* at 66–69.  He then hid out in a nearby creek "behind the Catholic church," where he remained for "a long time" until turning himself in after he watched "the white car" leave. *Id.* at 68.

### 2. The Search

Meanwhile, Officer Christian called for backup, not knowing that Mr. Marsili had exited out of the back of the house.  In addition to Officer Jenkins, who was not in uniform, doc. 26-1 at 40, and Officer Christian, Mr. Timko soon arrived in a Smithfield police cruiser and in a Smithfield police uniform, doc. 26-3 at 34.  Upon arrival, he testified that he "unholstered [his] weapon, because the call came in as a subject barricaded and possibly having weapons." Doc. 27-2 at 146.  He then "took up a tactical position on the side of the house with other officers who were surrounding the house." *Id.* at 146–47.  Several other law-enforcement officers soon arrived as well, including Joshua Haught, an officer from nearby Mt. Pleasant, *id.* at 152; Ben Coblentz, an officer from nearby Tiltonsville, *id.* at 282; Lee Thomas, Smithfield's assistant police chief, *see id.* at 85–86; Officer Price, a Jefferson County sheriff's deputy, doc. 26-3 at 39–40; and an additional officer whom the parties call Sergeant Krupinski, doc. 27-1 at 155.

As the officers gathered outside, Plaintiff testified that she finished her shower, "dried off quickly, put a towel on [her] head, [and] walked out" to look for her husband. Doc. 26-1 at 36.  After she could not find him, she walked over to the window and asked the officers what was going on.  They told her that they were looking for her husband; she responded that he was not in the house; they told her that they disagreed. *See id.* at 35–37; doc. 26-3 at 37–39.

6

The parties tell different versions of what happened next. Plaintiff testified that the officers "implied that they were going to come in." Doc. 26-1 at 37. According to Plaintiff, this led to the following exchange:

> And they said, Well -- I think they said something like -- you know, they implied that they were going to come in, or that they needed to come in, and I know I asked them if they had a warrant, and they said, We don't need one because he ran from us. And my response to that -- because I didn't know if that was true or not, I didn't want to get in trouble by, you know, not allowing them to do something I was supposed to let them do. So I said, Well, okay. I need -- Let me get dressed. And they said, Okay. And I shut the window.

*Id.* at 37. Plaintiff testified that she then got dressed and, before leaving the house, looked for husband in each of her home's bedrooms. *See id.* at 37–38. She says she also yelled down to the basement, "If you're down there, I'm letting them come in because I can't get in trouble." *Id.* at 38. Plaintiff then exited the house and testified that she stood outside near the curb.

On the other side, Officer Christian testified that the officers told Plaintiff to step outside. Doc. 26-3 at 38. According to him, after Plaintiff "finally opened up the door," and after "a couple demands of her to please step outside," Plaintiff "finally came out." *Id.* at 39. The officers then "hollered out for [Mr. Marsili] to come out of the house," and, after he did not respond, they "went over to Jessica . . . and asked her, if he was in the house. And she said she didn't see him. She says, 'Don't you need a search warrant?' And that's when [officer] Price said, 'No, we don't.'" *Id.* at 40. Officer Christian further testified that Plaintiff gave them consent to enter her house and search for Mr. Marsili. *Id.* at 49; *see* doc. 27-1 at 85 (Mr. Timko testifying to the same). Plaintiff did not testify as to whether or not she gave consent, and she does not contest this point in briefing the pending motions.

After Plaintiff exited the house, several officers went in "guns drawn" to perform a search. Doc. 26-1 at 39; *see* doc. 26-3 at 40 (Officer Christian testifying that three of the officers

present went in for the search). The officers encountered a minor problem right away. They ran into Plaintiff's dog, Zeus. Doc. 26-3 at 29; *see* doc. 27-1 (Officer Timko testifying that Zeus "was of a Doberman nature"); doc. 27-2 (Mr. Marsili noting that Zeus was a "King Doberman Pinscher"). The officers called Plaintiff into the house so that she could take Zeus outside. She did so, clipping him to a "tie-out rope on the deck." Doc. 26-1 at 42. Mr. Timko, who was positioned out back by this time, testified that he saw Plaintiff come out onto the deck with Zeus in hand. He told her to put Zeus back in the house. He testified that Plaintiff—in a profanity-laced response—told him that the other officers gave her the order to put Zeus out back. *Id.* at 157–58. He responded by telling her that he would "put [Zeus] down"—shoot him, in other words—if Zeus made "one aggressive move towards" him. *Id.* at 158. Mr. Timko further testified that Plaintiff "was flailing her arms in general disgust" during this exchange, *id.* at 158, and that, after he asked her to walk down the deck toward him, Plaintiff instead "went back inside and slammed the sliding glass door," *id.* at 160. Plaintiff testified that she did not have any discussions or encounters with any officers when she put Zeus out back. Doc. 26-1 at 43.

Mr. Timko and the other officers went back into the house to resume the search. Although Mr. Timko described the search as "long" and "meticulous," doc. 27-1 at 179, the officers did not find Mr. Marsili. Mr. Timko testified that he did not remember exactly how long he and the other officers searched the Marsili residence, *see id.* at 172, but, according to Officer Christian, the search lasted more than five minutes, and "[p]ossibly[] longer" than 10 or 15 minutes, doc. 26-3 at 42. While they did not find Mr. Marsili, the officers did find a rifle "hidden under the cushions" of a first-floor couch. Doc. 27-1 at 173.[2] Mr. Timko also testified

---

[2] According to Plaintiff, the search was eventful in another way. She testified that, when she returned home the day after the search, she found that her home had been damaged. She remembers the officers going on the roof during the course of the search, "breaking bricks off the chimney and [then] dropping them down in the chimney."

to hearing "commotion" outside of the house during the search, which another officer soon told him came from Plaintiff. *Id.* at 184. Mr. Timko characterized the yelling as "hostile" based on the volume and tone of the voice. *See id.* at 184–85. Unable to find Mr. Marsili, the officers exited the house and began to search elsewhere for him. Mr. Timko testified that he searched the house of the neighbor behind the Marsili residence, as well as a camper that was parked outside that neighbor's house. *See id.* at 89. Mr. Timko also testified to speaking to several surrounding neighbors who were outside on their porch watching the events unfold. *See id.* at 181.

### 3. The Arrest

The parties tell very different versions of the events before and during Plaintiff's arrest.

#### a. Plaintiff's Version

Plaintiff testified that she waited out by the curb in front of her house while the officers conducted their search and canvassed the neighborhood. She said that "[i]t felt like" she waited for "three hours" at the time, but that she later learned that the entire search process took about an hour and a half. Doc. 26-1 at 47. Regardless, she was worried about her dog, Zeus, whom she noticed was still tied up out back, "panting, trying to get some shade under the deck." Doc. *Id.* at 48. She wanted to get him some water and testified that she "thought about just going in my house to get the water, and I thought, Well, I better ask." *Id.* She did, approaching a nearby officer and asking him if she could go inside the house and get Zeus a water bowl. The officer

---

Doc. 26-1 at 47. She also testified to the following exchange with an officer she later found out was Sergeant Krupinski:

> I asked him, I said, Are they allowed to be doing that to my house? That's like, you know, serious damage to my chimney. And his only answer to me was, Oh, well, your house must be shoddy construction then. Isn't this a new house? Which it is not a new house.

*Id.* at 47. She also testified that the officers broke her "new expensive lamps that [she] had just bought." *Id.* at 114; *see* doc. 27-1 at 98 (Mr. Timko testifying "I don't recall" when asked whether he remembered anything being damaged during the search).

said he did not know, so he directed her to go ask a group of "four or five" officers standing in a group a few feet away up. *Id.* at 49. She asked all of them the same question. The officers

> all gave me the same answer that the first one did. And I asked -- I said, Can I go in my house and get my dog some water? And he just kind of looked, Hmm, I don't know. You'll have to ask him. And the one next to him said, Oh, I don't know. You'll have to ask him. And I went down and asked -- like I said, I think the fifth -- I think the last one was Timko, and he was behind his cruiser like with his open car door. I think he was like standing up radioing, or something. . . . And once I again, I could not get an answer yes or no. . . .

*Id.* at 51–52. When Mr. Timko "said, I don't know, ask him" and referred her back to where she started with the first officer, Plaintiff realized she "was going in a circle." *Id.* at 53. She then told the officers "You guys are playing games. I'm going in my house to get my dog some water." *Id.* As she tells it, that is "all [she] was able to get out" before Mr. Timko said "That's it," and then came from behind to put her in handcuffs and put her in a police cruiser nearby. *Id.* She testified that this all happened before she got a chance to start towards her house. *Id.* at 54.

Plaintiff was asked several times in her deposition if she ever was belligerent or rude to the officers in any way prior to her arrest. She answered no. *See id.* at 51–55. She also said that she did not use profanity toward Mr. Timko during the course of her interactions with him, including when he arrested her. *See id.* at 60. She does testify to being firm and straightforward with the officers. *See id.* at 53–54. When Mr. Timko put handcuffs on Plaintiff, even though she did not think she "had anything to apologize for," she "tried to apologize" to him. *Id.* at 60. "And he said, Nope. Nope. And he just put the cuffs on . . . ." *Id.*

Mr. Marsili's daughter—and Plaintiff's stepdaughter—Chailyn stood nearby as Plaintiff's arrest unfolded. According to Plaintiff, Chailyn said "[s]omething to the effect of . . . what the bleep are you arresting her for? She didn't do anything." *Id.* at 58. Plaintiff testified that Mr. Timko responded by arresting Chailyn and putting her in handcuffs. *See id.* at

58–59.  Plaintiff also testified that Chailyn did raise her voice and "cuss and swear" when she spoke to Mr. Timko prior to being arrested.  *See id.*

### b. Defendants' and Mr. Timko's Version

At some point during the search—and by the time of Plaintiff's arrest—Mr. Timko had declared to the other officers that he was in charge of the scene "[a]s the chief of police of the Village of Dillonvale."  Doc. 27-1 at 281.  As for the interaction with Plaintiff, he testified that did not recall hearing her ask the other officers about getting water for Zeus.  *See id.* at 190, 194–195.  He did recall telling Plaintiff that she needed to ask another officer about getting water for Zeus.  *Id.* at 196.  He also did not recall four or five officers standing in a group shortly before Plaintiff's arrest.  As he remembers it, "[t]he other officers were still maintaining their position securing the perimeter."  *Id.* at 190.  When asked whether any officers were still in the house, Mr. Timko testified, "I believe so, yes."  *Id.*  Mr. Timko remembers that he was standing next to his police cruiser; he testified that he "may have been on the radio," or he may have been "trying to get cooled off"—both because "it was such a hot summer day" and because he was the only officer who searched for Mr. Marsili in the attic.  *Id.* at 200.  He also remembers Plaintiff approaching to ask him if she could get Zeus some water, and that he told her to "wait until all the other officers are out of the house, it's for everybody's safety."  *Id.* at 192.  Mr. Timko says that he then gave Plaintiff an order not to go back into the house, to which she took umbrage: "[she] flailed her arms up, or as you said flapped them, and stated, This is f—king ridiculous. You're a f—king joke. I'm going in the f—king house, and started to turn towards and take steps towards the residence."  Doc. 27-1 at 196–97.

Mr. Timko also testified that he asked Plaintiff multiple times to stop walking towards the house before he arrested her.  *See id.*  According to Mr. Timko, Plaintiff responded by saying

11

"that she was going to continue and do whatever the f—k she pleased." *Id.* at 197–98. Mr. Timko testified that he only decided to arrest Plaintiff when she ignored his command to stop. When he caught up to her, he grabbed her right wrist from behind. *See id.* at 203. As he did so, he testified that "she had . . . a reaction to kind of shove off," *id.*, and "come around . . . towards [him]," *id.* at 204. Based on her "nasty [and] argumentative tone," Mr. Timko judged Plaintiff to be in a "hostile and aggressive state," and that he therefore did not know whether "she was going to attempt to hit [him] or not." *Id.* When asked whether Plaintiff made a violent move toward him during her arrest, Mr. Timko responded by saying that "[t]he potential for [Plaintiff] to turn around and swing and hit me was absolutely there." *Id.* at 207. When asked whether Plaintiff punched him, he responded that "[t]he act was not completed," but that he "believe[d] that the left arm was coming in." *Id.* at 212. After he restrained Plaintiff physically, he "gently pushed her towards" a nearby cruiser. *Id.* at 210. He told her to calm down more than once as she "continued to berate and cuss" at him. *Id.*[3]

At this point, according to Mr. Timko, Plaintiff's stepdaughter Chailyn "came rushing up the road" yelling that Mr. Timko "better . . . let her the f—k go." Doc. 27-1 at 213. Mr. Timko explained that "Officer Coblentz had to physically restrain Chailyn from coming over and attacking me," all the while Plaintiff yelled "What the f—k are you doing? What the f—k are

---

[3] Officer Thomas, also present for the arrest, gave the following testimony about the interaction between Plaintiff and Mr. Timko:

> Mrs. Marsili was getting upset saying that she wanted to get water for her dog. And Timko said, "You can't go in there right now.'" She started getting upset and started cussing and said, "I'm going in there, this is a f—king joke.'" And Timko says, "You can't go in there right now.'" So she started that way, and he came around the back and grabbed ahold of her; and told her, "[']You can't go in there right now.'" She said, "[']This is a joke, I need to get some f—king water for my dog.'" He says, "[']I understand, you can't go in right now.'"
> And so the next thing I know he brought her back towards the cruiser. And as he brought her back towards the cruiser, and she got closer to the cruiser, she jerked her arm away -- or something like that.

Doc. 26-5 at 46–47.

you doing?" *Id.* at 214. It was only at this point that Mr. Timko got Plaintiff to the cruiser and told her that she was under arrest. *Id.* Mr. Timko further testified that the entire interaction— "[i]ncluding what the stepdaughter did"—"is part of why [he] arrested [Plaintiff]." *Id.*

When asked in his deposition why he would not let Plaintiff go into the house to get water for Zeus, Mr. Timko gave several reasons. He testified that he did not know what Plaintiff intended to do when she entered the house. *See id.* at 224. He also said:

> [A]nything is possible. Given the facts and circumstances of her attitude and how she was acting towards the officers, I would say that it was a major safety concern, especially given the fact that you had officers still conducting an active search with guns drawn, officers outside the house securing the perimeter with guns drawn and the fact that there was one rifle that was found hidden underneath the cushion of a couch.

*Id.* at 224–25. He added that, based on "[t]he hostile and aggressive nature of her, I would state she could have been unpredictable." *Id.* at 225. When asked which officers were still inside the house, Mr. Timko responded, "I cannot name exactly what officer it would have been." *Id.* This statement led to the following exchange during his deposition:

Q.    When did those officers come out in relation to your arrest?

A.    I don't recall. It may have been after the arrest --

Q.    Don't guess.

A.    -- during the arrest.

Q.    Don't guess.
      Did you see any officers come out during your arrest?

A.    My attention was directed on her.

      . . . .

Q.    So, since you weren't looking, the answer is, No, I didn't see anybody come out of the house, right?

A.    My attention was drawn on Mrs. Marsili, so I could not see anybody, if there was or was not.

Q.    Right. That's really the question.
      And how did you know that the officers that you claim you knew somehow were inside the house, how did you know they had their guns drawn in there? Can you see through walls?

A.    Because they were still doing an active search, sir.

Q.    Who was?

A.    Whatever officers were still in the house.

Q.    But you don't know if any were, right?

A.    To the best of my knowledge, they were, and I stated that there was.

Q.    But what evidence do you have that that was true? You didn't see anybody come out, you can't name any.

A.    I couldn't see anybody come out if my back was turned towards the house because my attention was on her during the process of placing her under arrest.

Q.    So, how can you swear there were policemen in there?

A.    How can you tell me that there wasn't?

Q.    What you're saying is there might have been, right?

                    MR. CALDERONE: Objection.
It's been asked and answered. He told you that he recalled officers being in the house.

BY MR. McNAMARA:

Q.    Who were the last officers that you saw go into the house before you arrested Mrs. Marsili?

A.    I don't recall.

Q.    How long before you arrested Mrs. Marsili do you claim you saw someone go into the house?

A.    I don't recall.

14

Doc. 27-1 at 225–28.

Officer Christian was also present for the arrest. He testified that Mr. Timko was interviewing Plaintiff's stepdaughter, Chrissy, right before the arrest. *See* doc. 26-3 at 48. According him, Plaintiff interrupted the interview by "jumping up and down" while saying that she needed to get water for Zeus. *Id.* Officer Christian testified that both he and Mr. Timko told her to sit down until they finished the search. *Id.* at 48–49. He also said that Plaintiff interrupted the officers several times while they were talking to each other. *See id.* at 50–55. Despite seeing these interruptions, Officer Christian testified that he did not see the interaction between Plaintiff and Mr. Timko that led to her arrest, only witnessing Mr. Timko bring Plaintiff to the cruiser. *See id.* at 62; *id.* at 65 ("Q. You didn't hear or see any incident between she or Timko? A. No."). Neither Mr. Timko nor Plaintiff testified about Mr. Timko's alleged interview of Chrissy.

### 4. The Prosecution

After Plaintiff's arrest, Mr. Timko transported her to the Jefferson County Justice Center. Doc. 28-1 at 16 (Ex. 11). Plaintiff stayed there overnight and was released from custody the next day. Doc. 26-1 at 67. Also on the next day, August 20, 2010, Mr. Timko completed and turned in a report to the Jefferson County Prosecutor's Office. Doc. 27-1 at 232–33. The report included a short synopsis, from Mr. Timko's point of view, of the events that unfolded on August 19, 2010 that led to Plaintiff's arrest. It listed two offenses under the "arrest/offense code" category—"Obstructing Official Business" and "Disorderly Conduct interfering w/ others." Doc. 28-1 at 16 (Ex. 11). When Mr. Timko and Officer Christian delivered the report to the prosecutor's office, they met with Jeff Bruzzese, an assistant Jefferson County prosecutor. Doc. 27-1 at 240. Based on the report, charges were initiated against Plaintiff: one for obstructing official business in violation of Ohio Revised Code § 2921.31(A), one for persistent

disorderly conduct in violation of Ohio Revised Code § 2917.11(A)(2), and one for obstructing justice in violation of Ohio Revised Code § 2921.32(A)(1). Doc. 2-1 at 1–2. The first two are misdemeanors and the last one is a felony. *Id.* Mr. Timko signed the complaint, with the titles of "Chief W.A. Timko, III" and "Dillonvale Police Dept." *Id.* at 2.

Mr. Timko testified that he did not type up this complaint document. Doc. 27-1 at 233. He also testified that he did not recall what he said in his meeting with Mr. Bruzzese on August 20, 2010. *See id.* at 245–46. Mr. Bruzzese offered testimony on the matter during a deposition taken for another case (the Bikoski case) in the Southern District of Ohio brought by a different Jefferson County resident, Walter Bikoski, Jr., also against the Dillonville and Mr. Timko, among other defendants. *See Bikoski v. Village of Dillonvale*, No. 2:13-cv-00467, compl. (doc. 2). In the context of questions about the Bikoski case, Mr. Bruzzese testified that, in the majority of cases, Jefferson County police departments fax the applicable reports to the prosecutor's office rather than personally drop them off. Doc. 39-2 at 9. In some cases, "[i]f there are things to discuss, we'll either call [the police department], or they'll maybe call us over the phone." *Id.* Mr. Bruzzese testified that Mr. Timko and Officer Christian showed up at the prosecutor's office and "requested" that charges be filed against Plaintiff. *Id.* at 21–22. In response to being asked whether Mr. Timko "was urging a prosecution" against Planitiff, Mr. Bruzzese replied, "Yes. He was happy when – when charges were filed against both of them." *Id.* at 22–23. That led to the following exchange:

> Q. In both, Mr. Bikoski's case and that Marsili case then, the way it would work is, after the Dillonvale officers made their presentation, convinced you to have charges typed up, then those charges would be sent to the court, and the officers would have to go and sign and swear to them there at the courthouse?
>
> A. Correct.
>
> Q. Okay.

16

And then it would be the officers themselves who would file the charges after they had sworn to the truthfulness of the contents?

A.     Correct.

Q.     And, again, with regard to Mrs. Marsili's prosecution, Chief Timko certainly could be said to have participated in the decision to prosecute her; correct?

A.     Yes.

Q.     And his input certainly aided and influenced the decision to prosecute Mrs. Marsili?

A.     Very much.

*Id.* Plaintiff attaches Mr. Bruzzese's deposition as an exhibit to her memorandum in opposition, doc. 39-2, to Dillonvale's motion for summary judgment, doc. 31. In response, Dillonvale has moved to strike the deposition as an exhibit. Doc. 41.

At some point after initiating charges against Plaintiff, the matter came before Jefferson County Court Judge David Scarpone. Doc. 27-1 at 257. Mr. Timko testified that he remembered going to court at least once to serve as a prosecuting witness against Plaintiff. *Id.* According to Plaintiff, her lawyer indicated to her that "up until that last day . . . a couple of the officers that were in there were still pushing to charge [Plaintiff] with a felony." Doc. 26-1 at 72. After further negotiations, however, the final deal involved the dismissal of all charges against Plaintiff, while Mr. Marsili would then plead guilty to "the misdemeanor disorderly conduct." *Id.* at 73. An order of the Jefferson County Court, District Three, confirms that "[u]pon Motion of the State of Ohio, all charges against the Defendant [were] dismissed." Doc. 2-2.[4]

---

[4] After the events in question and five days after Plaintiff brought her case, Mr. Timko resigned as Dillonvale Chief of Police on August 22, 2012. *See* doc. 27-7 at 20.

**B. Procedural Background**

Based on these facts, Plaintiff initiated suit in this Court in August of 2012.  Doc. 2.  She brings four claims, all under 42 U.S.C. § 1983: that Mr. Timko's conduct constituted (1) false arrest in violation of the Fourth Amendment, (2) malicious prosecution in violation of the Fourth Amendment, (3) retaliation in violation of the First Amendment; and (4) she also brings a *Monell* claim against Dillonvale for Mr. Timko's conduct.  *Id.* ¶¶ 20–23.  Thereafter, Plaintiff moved for summary judgment against Mr. Timko on the first two counts of her complaint, for false arrest and malicious prosecution.  Doc. 28 at 1.  Dillonvale has moved for summary judgment on Plaintiff's *Monell* claim.  Doc. 31 at 1.  Smithfield also moved for summary judgment as to Plaintiff's claim under count four.  Doc. 32 at 1.  Smithfield and Plaintiff then filed a stipulation dismissing Smithfield as a defendant, and dismissing with prejudice Plaintiff's claim under count four as applied to Smithfield.  Doc. 33 at 1; *see* doc. 34 (Smithfield's notice of withdrawal of its motion for summary judgment, stating in part that its "motion for summary judgment is now moot," and that it "withdraw[s] its motion for summary judgment").

Three other motions remain pending.  Mr. Timko submits a joint motion *in limine* and motion to strike regarding evidence related to his prior arrests for a D.U.I., as well as evidence related to a number of prior complaints from Dillonvale citizens.  Doc. 37.  Dillonvale moves to strike Exhibit 1 attached to Plaintiff's memorandum in opposition to its motion for partial summary judgment, doc. 41; Exhibit 1 is a copy of Mr. Bruzzese's deposition from the Bikoski case.  Finally, Mr. Timko moves for judgment on the pleadings as to any claims asserted against him in his official capacity as an employee or agent of Smithfield.  Doc. 43.

## II. MOTIONS FOR SUMMARY JUDGMENT

### A. Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party (who has the burden of proof at trial) fails to make a showing sufficient to establish the existence of an element essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the initial "responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ( "genuine" more than "some metaphysical doubt as to the material facts").

### B. Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment on the first two counts of her complaint. She bases both counts on the Fourth Amendment—one for false arrest and one for malicious prosecution. *See Stemler v. City of Florence*, 126 F.3d 856, 871 (6th Cir. 1997) (false arrest); *Thacker v. City of Columbus*, 328 F.3d 244, 258 (6th Cir. 2003) (malicious prosecution). As an initial matter, the parties present two very different versions of Plaintiff's and Mr. Timko's

conduct prior to and during her arrest.  They have identified disputes of fact, and the issue is whether those disputes of fact are genuine.  *Celotex*, 477 U.S. 317, 322 (1986).  The Court must credit Mr. Timko's version of the facts to answer this question.  *See Liberty Lobby*, 477 U.S. at 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

### 1. Count 1: False Arrest

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause" for the arrest.  *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010).  Plaintiff was ultimately charged for three offenses: obstructing official business in violation of Ohio Revised Code § 2921.31(A), persistent disorderly conduct in violation of Ohio Revised Code §§ 2917.11(A)(2) & (E)(3)(a), and obstructing justice in violation of Ohio Revised Code § 2921.32(A)(1). Doc. 2-1 at 1–2.  At the time of her arrest, however, Mr. Timko only listed obstructing official business and disorderly conduct on the police report.  Doc. 28-1 at 16 (Ex. 11).  The Court turns now to the parties' dispute over whether Mr. Timko had probable cause to arrest Plaintiff for either of these offenses.

"A police officer has probable cause if there is a fair probability that the individual to be arrested has either committed or intends to commit a crime."  *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (internal quotation marks omitted).  This depends on whether "the facts known to the arresting officer at the time" would "warrant a prudent man in believing that the offense has been committed."  *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007); *see Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) (noting that the inquiry requires the officer to "consider the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence, before determining if he has probable cause to make an arrest").  "The

substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *United States v. Romero*, 452 F.3d 610, 615–16 (6th Cir. 2006) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).  On the other side, a "mere suspicion of criminality . . . is insufficient to support a finding of probable cause." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) (internal quotation marks omitted).

"Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." *Logsdon*, 492 F.3d at 341 (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)).  Starting with disorderly conduct, Mr. Timko originally arrested Plaintiff for a violation of Ohio Revised Code § 2917.11(A)(4) (prohibiting the "[h]indering or preventing the movement of persons on a public street, road, highway, or right-of-way, or to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender").  Plaintiff was eventually charged with a different subsection of the disorderly conduct statute, which prohibits someone from "[m]aking unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person."  *Id.* § 2917.11(A)(2).  None of the deposition testimony addresses this discrepancy expressly.  The Court thus addresses probable cause as to the disorderly conduct charge over which the parties argue: § 2917.11(A)(2).

Whether the arrest for this offense "survive[s] constitutional scrutiny" depends on the facts before Mr. Timko "at th[e] moment [of the arrest]." *Thacker v. Lawrence Cnty.*, 182 F. App'x 464, 469 (6th Cir. 2006).  Crediting his testimony, Mr. Timko had the following before him at the time he arrested Plaintiff.  Plaintiff used profane language in responding to his order to put Zeus back in the house; flailed her arms in disgust while doing so; and disobeyed his command not to walk back through the house after putting Zeus on the tie-out rope out back.

Based on what another officer told him, he heard Plaintiff yelling in a hostile manner during the course of the search. At the time Plaintiff approached him about Zeus, Mr. Timko remembers that several officers maintained their positions securing the perimeter of the house. He believed that other officers—although he could not name which ones—remained in the house to finish conducting a search. Plaintiff asked him about the water; after he said no, Plaintiff flapped and flailed her arms, telling him "This is f—king ridiculous," and "You're a f—king joke." Doc. 27-1 at 196. She turned around and walked toward the house, ignored several orders not to do so, and told him she was going to do "whatever the f—k she pleased." Doc. 27-1 at 197–98. As he grabbed her, she turned toward him in what he interpreted as an aggressive manner. He restrained her, moved her toward the police cruiser, and told her to calm down several times. She did not do so, continuing to berate, yell at, and use profanity toward him.

The standard for a disorderly conduct violation of this sort under Ohio law is whether "the profane language . . . [was] likely to inflict injury or provoke the average person to an immediate retaliatory breach of the peace." *State v. Wood*, 112 Ohio App. 3d 621, 627, 679 N.E.2d 735, 739 (Ohio Ct. App. 1996) (quoting *State v. Hoffman*, 57 Ohio St. 2d 129, 387 N.E.2d 239 (1979) (paragraph one of the syllabus)). Ohio courts have interpreted this to "prohibit[] punishment under R.C. 2917.11(A)(2) unless the words spoken were 'fighting words.'" *Id.* As to what counts as "fighting words" towards police officers: "there is a distinction between the mere use of profane language in the presence of the police officer," which is not violation, "and when the language is directed to the officer personally," which is. *Id.* Some cases clearly constitute a violation. *See, e.g., id.* at 628, 679 N.E.2d at 739 ("[The defendant] approached the officers, provided officers the gesture of the middle finger, told the officers 'f—k you' and continued loud abusive language for several minutes and the language

continued upon several requests to [stop]."). Some clearly do not implicate the statute. *See, e.g.,* *Wilson v. Martin*, No. 13–3543, 2013 WL 5567729, at *2, ___ F. App'x ___, ___ (6th Cir. Oct. 8, 2013) (where "an 11 year-old girl raised her middle fingers toward an adult male police officer"). Some cases, like this one, fall somewhere in the middle. For that reason, and because several issues remain when crediting Mr. Timko's version of the facts, Plaintiff cannot prevail on her motion for summary judgment as to this count.

First, Plaintiff used profanity toward Mr. Timko before he even apprehended her. She told him that his order not to go back in the house was "f—king ridiculous," that she was "going in the f—king house," and that he was "a f—king joke." Doc. 27-1 at 196–97. Although some of these statements were not directed at Mr. Timko, one was—again, Plaintiff told him he was "a f—king joke." At least one member of a reasonable jury could find that this statement qualifies as "fighting words" "directed to the officer personally." *Wood* at 627, 679 N.E.2d at 739. Second, further supporting this conclusion, Mr. Timko testified that Plaintiff appeared physically animated—"flapping" and "flailing"—while using aggressive speech directed at him. Her "language, together with [her] actions and gestures" could have been read as "provocative" enough to incite an average person to violence. *Id.* at 628, 679 N.E.2d at 740.

Plaintiff's arguments to the contrary do not change this conclusion. She first makes two related arguments that have to do with her potential revocation of the consent to search—one, Mr. Timko did not have any probable cause to justify his order for her not to go into the house; and two, for this reason, she was justified in revoking her consent. Plaintiff's statement of the law on consent is correct: "A person who consents to a warrantless search has the right to restrict the scope of the search." *United States v. Tatman*, 397 F. App'x 152, 162 (6th Cir. 2010). But, as to her first argument, whether or not Mr. Timko's order was justified does not affect whether

she properly revoked her consent. Instead, the guiding standard for revocation of consent regarding the scope of a search is whether the "typical reasonable person [would] have understood" Plaintiff's words to revoke her consent. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (internal quotation marks omitted). Applied here, before directing her profane statements toward Mr. Timko, all she did was *ask* him whether she could go into the house. At this stage, and on these facts, a reasonable person would not have understood Plaintiff's question as a clear revocation of consent. To be sure, right after she told Mr. Timko that he was "a f—king joke," doc. 27-1 at 196, she also said "I'm going in the f—king house," *id.* However, the Court need not address whether her last statement was enough to revoke the search. By this time, she had already used language toward Mr. Timko that gave him probable cause for her arrest.

Plaintiff also argues that, the consent issue aside, her language does not support a disorderly conduct arrest as a matter of law. The cases she cites for this point, however, either do not apply to the facts or do not support her argument. *See City of Houston v. Hill*, 482 U.S. 451, 455 (1987) (holding a Houston ordinance—"Assaulting or interfering with policemen"— facially overbroad); *Kennedy v. City of Villa Hills*, 635 F.3d 210, 215 (6th Cir. 2011) (finding a genuine issue of material fact as to whether an arrestee yelled when cursing and calling an officer "a fat slob"); *Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997) (holding that use of "the 'f-word' in and of itself is not criminal conduct" in the context of a citizen driving by "a group of abortion protestors" and shouting "f—k you"); *Perkins v. City of Gahanna*, No. C2-99-533, 2000 WL 1459444, at *3 (S.D. Ohio Sept. 21, 2000) (officer lacked probable cause as to an eventual arrestee who was walking away from the officer and said, "'hey officer, hey officer' . . . . 'have a nice day.' and flipped me off with his middle finger"); *State v. Hoffman*, 57 Ohio St. 2d 129, 132, 387 N.E.2d 239, 242 (Ohio 1979) (reversing and remanding because the court of appeals

24

"did not follow [the proper] method of construction with respect to R.C. 2917.11"); *City of Cincinnati v. Karlan*, 39 Ohio St. 2d 107, 110, 314 N.E.2d 162, 164 (Ohio 1974) (holding multiple uses of the term "prick-ass cops" to be fighting words strong enough for criminal liability under a Cincinnati ordinance); *State v. Dotson*, 133 Ohio App. 3d 299, 301, 727 N.E.2d 957, 958 (Ohio Ct. App. 1999) (reversing a jury's finding of disorderly conduct against a citizen who yelled "f—k you" repeatedly to a police officer, and called the officer a "motherf—ker").

In short, a reasonable jury—based on Mr. Timko's version of the facts—could find that he had probable cause to arrest Plaintiff for disorderly conduct. A genuine dispute of material fact thus remains regarding Mr. Timko's and Plaintiff's conduct up to the point of arrest. This conclusion also resolves, at least at this stage, the probable-cause issue as to the other two offenses (to the extent that Plaintiff advances her false-arrest claim on the obstruction of justice charge as well). If Mr. Timko had probable cause to arrest Plaintiff for disorderly conduct, her false-arrest claim as to the other two offenses would necessarily fail. *See Voyticky v. Village of Timberlake*, 412 F.3d 669, 676 (6th Cir. 2005) ("We have held that where no probable cause exists to arrest a plaintiff for a particular crime, but that probable cause exists to arrest that plaintiff for a related offense, the plaintiff cannot prevail in a suit alleging wrongful arrest brought pursuant to 42 U.S.C. § 1983." (citing *Avery v. King*, 110 F.3d 12, 14 (6th Cir. 1997)).

### 2. Count 2: Malicious Prosecution

"The Sixth Circuit recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment." *Sykes*, 625 F.3d at 308 (internal quotation marks omitted); *see Wallace v. Kato*, 549 U.S. 384, 390 (2007) (malicious prosecution exists to "remed[y] detention accompanied . . . by *wrongful institution* of legal process" (internal quotation marks omitted)). To succeed on this claim, a plaintiff must prove four elements: (1) "a

criminal prosecution was initiated against the plaintiff and that the defendant ma[d]e, influence[d], or participate[d] in the decision to prosecute," *id.*; (2) "lack of probable cause for the criminal prosecution," *id.*; (3) that the plaintiff suffered a deprivation of liberty apart from the initial arrest as a result of the institution of criminal proceedings, *id.* at 309; and (4) "the criminal proceeding must have been resolved in the plaintiff's favor," *id.* The parties argue in primary part about the second element.

The probable-cause inquiry for a malicious-prosecution claim has two parts: whether there was probable cause to "justify an arrest *or* a prosecution." *See, e.g.*, *Sykes*, 625 F3.d at 310–11 ("[W]e must consider not only . . . probable cause to arrest the Plaintiffs but also whether probable cause existed to initiate the criminal proceeding against the Plaintiffs."); *see also Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007) ("What is certain, however, is that such a claim fails when there was probable cause to *prosecute* . . . ." (emphasis added)). When focused on the prosecution, the probable-cause inquiry requires the Court to consider the "facts and circumstances known at the time the offense[s] [are] charged." *Thacker*, 328 F.3d at 261. The Court has already found that, crediting Mr. Timko's facts, a reasonable jury could find probable cause for the disorderly conduct arrest. It thus addresses the probable-cause question regarding the other two offenses: obstructing official business and obstructing justice.

### a. Obstructing Official Business

A charge for obstruction of official business under Ohio law has three elements: "(1) No person, without privilege to do so; (2) with purpose to prevent, obstruct or delay the performance by a public official of any authorized act within his official capacity; (3) shall do an act which hampers or impedes a public official in the performance of his lawful duties." *Patrizi v. Huff*, 821 F. Supp. 2d 926, 932 (N.D. Ohio 2011) (citing Ohio Rev. Code § 2921.31(A)). According

26

to Officer Christian's testimony, Mr. Timko interviewed Chrissy, Plaintiff's stepdaughter, shortly before Plaintiff's arrest. As the Court explained in the facts section, Officer Christian testified that Plaintiff interrupted the interview by "jumping up and down" while saying that she needed to water her dog. Doc. 26-3 at 48. Officer Christian also testified that both he and Mr. Timko told her to sit down until they released her to go back into the house. Doc. 26-3 at 48–49. He also said that Plaintiff continued to interrupt the officers several times while they were talking to each other. *See* doc. 26-3 at 50–55.

Under the facts available at the time of charging, a reasonable jury could find that the charging officials reasonably believed that Plaintiff obstructed official business. "Repeated interruptions or disruptions of an officer's questioning of an individual *may* provide probable cause for obstructing official business under Oh. Rev. Code 2921.31(A)." *Burr v. Perkins*, No. 2:04-CV-786, 2006 WL 2165701, at *6 (S.D. Ohio July 31, 2006); *see N. Ridgeville v. Reichbaum*, 112 Ohio App. 3d 79, 84–85, 677 N.E.2d 1245, 1248 (Ohio Ct. App. 1996) (repeatedly refusing to follow directions and shouting to prevent police–witness interview justified arrest and conviction for obstruction of official business); *State v. Fort*, No. 99–CA–219, 2003 WL 930487, at *3–4 (Ohio Ct. App. Mar. 7, 2003) (repeated questioning of officers during an investigation forced officers to stop their investigation and deal with the defendant constituted sufficient evidence for obstruction of official business). Based on this law, and according to the facts available to the charging officers at the time of prosecution, a reasonable juror could find that probable cause existed for the obstruction of official business charge.

Plaintiff's advances several counterarguments, none of which convinces the Court otherwise. She first argues that Mr. Timko's testimony contradicts Officer Christian's as it pertains to Plaintiff interrupting Chrissy's interview. She specifically argues that Officer

27

Christian testified that Plaintiff's interruption of Chrissy's interview—not Plaintiff bothering Mr. Timko at his cruiser—led to Plaintiff's arrest. The Court disagrees. Officer Christian's deposition demonstrates that he did not testify that the interruption led to her arrest. He did testify that the interruption took place. He also testified that he did not see the final interaction between Plaintiff and Mr. Timko that led to her arrest, only witnessing Mr. Timko bring Plaintiff to the cruiser. Based on this testimony, Mr. Timko and Officer Christian do not necessarily present conflicting stories about Plaintiff's arrest. Neither Plaintiff nor Mr. Timko testified regarding whether or not he interviewed Chrissy, and whether or not Plaintiff interrupted him. Officer Christian, however, did. In other words, that someone testified to the matter while another person did not does not mean that their testimony conflicts. It means that Officer Christian's testimony is uncontroverted at the summary-judgment stage. And, given that he participated in the charging process, his testimony matters and thus carries the day on the issue of probable cause for prosecution.

Plaintiff again brings up the matter of consent, arguing that—interruption of Chrissy's interview or not—she had the authority to revoke her consent of the search. This may well be the case, but the issue of consent as it pertains to the search is a separate matter. Crediting Officer Christian's testimony, Plaintiff interrupted Mr. Timko during the course of an investigatory interview and, when told to do stop, failed to do so. Even if she lawfully revoked her consent for the search, it would not have given her the privilege to interrupt and interfere with an ongoing investigation that occurred outside of the house, away from the search. Viewing the testimony in a light most favorable to Mr. Timko, a reasonable jury could thus conclude that the charging officers had probable cause to initiate prosecution on this count. For these reasons,

a genuine dispute of material fact remains as to whether Plaintiff obstructed official business. Plaintiff's motion thus fails on this count.

### b. Obstructing Justice

Plaintiff was also charged with obstructing justice under Ohio Revised Code § 2921.32(A)(1). This section provides that "[n]o person, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime or to assist another to benefit from the commission of a crime, . . . shall . . . [h]arbor or conceal the other person." Applied here, the charging officials had to have probable cause to believe that Plaintiff, acting with the purpose to hinder the apprehension of her husband, harbored or concealed him "through conduct which went beyond a mere oral misstatement." *State v. Logan*, 77 Ohio App. 3d 333, 336, 602 N.E.2d 308, 310 (Ohio Ct. App. 1991).

Mr. Timko has identified two disputes of fact on this count. The first has to do with what Plaintiff said to the officers when she first spoke to them at the window. For context, before their conversation, at least two officers, Christian and Jenkins, saw Mr. Marsili run into his house at the conclusion of the chase. When Plaintiff first came to the window to talk to the officers on the scene, at least two officers testified that she told them that she not seen her husband. *See, e.g.*, doc. 26-3 at 129; *see also* doc. 26-5 at 30. Mr. Timko added an additional layer to this statement in his deposition; he testified that, as the search for Mr. Marsili drew to a close, the officers conferred and agreed that Plaintiff "stated that she had seen *or heard* from her husband." Doc. 27-1 at 231 emphasis added). Plaintiff's deposition testimony demonstrates that she intimated to Officer Jenkins that she talked to her husband before he left the house. *See, e.g.*, doc. 26-1 at 44 ("I asked him if he was the one in the white car, and he said, Yes. And I said, Well, my husband said that you tried to wreck him."). Based on this, the dispute of fact has to do

with what Plaintiff said to the officers and whether her statement to Officer Jenkins contradicted that earlier statement.  If she indeed said that she had not heard from him and then later told Jenkins that she talked to her husband, that could be viewed as contradictory.  The second dispute, according to Mr. Timko, is that "later on" during the investigation Plaintiff "recanted her story after being confronted by Officer Christian, I believe." Doc. 27-1 at 231.

The Court pauses to note that the record is less than clear and less than fully developed on these two points.  As to the first, none of the police reports filed after the incident notes that Plaintiff told the officers that she had not *seen* her husband, or that she had not *heard from* her husband.  Those that do speak to the matter indicate that she told the officers that she did not know where her husband was.  Still, Mr. Timko does testify that—despite not including this bit in his police report—he understood Plaintiff to have told the officers first on the scene that she had not seen or heard from her husband.  As to the second point, none of the officers' deposition testimony explains further what Mr. Timko meant by his statement that she recanted her story.  Nor did Plaintiff speak to the issue in her deposition.  On the other side, Mr. Timko did testify that he understood—although he could not provide any additional detail as to the issue—that Plaintiff had "recanted" her story regarding not seeing her husband, and that she had done so to Officer Christian.  In short, a dispute of fact exists as to whether Plaintiff told the officers that she had not seen or heard from her husband (when her testimony indicates that she had), and as to whether she later recanted her statements.

These disputes only matter if they are material to the issue at hand: whether a reasonable jury could find that the charging officials reasonably believed that Plaintiff obstructed justice.  As Mr. Timko points out, the case of *State v. Blackson* helps resolve this issue.  There, Mr. Blackson, the defendant, was arrested for and "charged with obstructing justice in violation of

R.C. 2921.32(A)(1)" when he admitted to lying to the police. 1997 WL 89218, at *1–2 (Ohio Ct. App. Feb. 26, 1997). Mr. Blackson watched as two women—one his current girlfriend, Ms. Johnson, and one his previous girlfriend, Ms. Andrews—fought over him. *Id.* at *1. During the fight, Ms. Johnson slashed Ms. Andrews in her abdomen. *Id.* Eventually, the police found Blackson at his mother's house. They asked Mr. Blackson whether Ms. Johnson was inside. He told them no, but later admitted that she was and that he had lied earlier. *Id.* The *Blackson* court held that these facts supported a conviction under Ohio Revised Code § 2921.32(A)(1), the same statute at issue here. *Id.* at *2. *Blackson* thus stands for the proposition "that verbal statements intended to deceive a police officer to impede or delay discovery of the fugitive is 'harboring' just as surely as if the defendant had concealed the fugitive physically." *Id.*

With *Blackson* as background, the disputes of fact in this case are material to whether or not the officers had probable cause to charge Plaintiff with obstructing justice. Viewed in Mr. Timko's favor, a reasonable juror could find that a reasonable officer in Mr. Timko's position would believe that Plaintiff's erroneous statements about not hearing from or seeing her husband—if indeed erroneous—constituted the type of verbal statements intended to impede the detection of a fugitive. More, a dispute of fact exists as to whether, and to what extent, Plaintiff "recanted" what she told the police when they first arrived at her house. If she did recant and admit to lying to the officers, it would further underscore the reasonableness of the obstructing-justice charge. Whether or not she did, and whether or not she told the officers that she had not seen or heard from Mr. Marsisli, however, is not a question for the Court to answer at this stage. For these reasons, Plaintiff's motion on the malicious-prosecution count is also denied.

Her arguments to the contrary fail to convince the Court. She argues that none of the above demonstrates that she acted with proper mental state—purpose—to impede or delay her

husband's discovery.  Crediting Mr. Timko's testimony, however, demonstrates that a reasonable jury could find otherwise.  At the time of charging, Mr. Timko and the charging officers had more than just one incident from which to draw regarding her mental state.  They witnessed Plaintiff use profanity toward them several times, and they witnessed her act in a hostile manner toward the officers while they were in middle of conducting a search for her husband.  Her potentially untruthful statements, when viewed with her other behavior, could provide a reasonable jury with enough to find that she acted with the proper mental state when she first spoke to the police.  *See, e.g.*, Ohio Rev. Code § 2901.22(A) ("A person acts purposely when it is h[er] specific intention to cause a certain result . . . .").

She also points to the post-incident police reports, which have her telling the officers that she did not know where Mr. Marsili was at the time the officers asked her.   She takes this one step further to argue that the difference between saying she "had not seen him" and "did not know where he was" amounts to quibbling over semantics.  Even if so, none of this addresses Mr. Timko's statement that she told police that she "had not heard from" her husband.  Nor does it address Mr. Timko's statement that Plaintiff recanted her story as the investigation was coming to a close.  With each of these additional statements by Mr. Timko, Plaintiff's potentially misleading statements amount to more than a dispute over semantics.  Her motion is thus denied.

## C. Dillonvale's Motion for Summary Judgment

Dillonvale moves for summary judgment on Plaintiff's claim for municipal liability according to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  *Monell* imposes municipal liability under section 1983 when (1) a constitutional violation has occurred and (2) the municipality "is responsible for that violation," *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505 (6th Cir. 1996), based on the "execution of a government[] policy or custom," *Monell*, 436 U.S. at

694. Dillonvale assumes for the sake of argument that two constitutional violations occurred in this case—Plaintiff's Fourth Amendment right to be free from false arrest, and her Fourth Amendment right to be free from malicious prosecution. The parties focus their argument on the second element: whether Mr. Timko's actions render Dillonvale liable.

*Monell* made clear that a municipality generally cannot be held liable for the unconstitutional actions of one of its employees. 436 U.S. at 694 ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."); *see also Bd. of Cnty. Com'rs v. Brown*, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of *respondeat superior*."). In order to avoid *respondeat superior* liability, the Supreme Court has reiterated that a plaintiff in this situation must "identify a municipal policy or custom that caused the plaintiff's injury." *Brown*, 520 U.S. at 403 (internal quotation marks omitted). A plaintiff has "at least four avenues" available "to prove the existence of a municipal's illegal policy or custom": "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). Plaintiff does not assert that a legislative enactment or official agency policy led to the violation of her constitutional rights. The parties disagree over whether the remaining three options for municipal liability apply in this case.

### 1. Acquiescence to Violations

Plaintiff maintains that Dillonvale failed to discipline or otherwise act in the face of a number of Mr. Timko's alleged on-the-job improprieties. For example, she points to Mr. Timko's deposition testimony that the mayor of Dillonvale did not discipline him for a D.U.I.

33

violation in 2010. Plaintiff also points to Dillonvale's failure to act following three other incidents. One allegedly took place on July 1, 2010, when two Dillonvale residents went to the police department to report a late-night fireworks incident. According to their account, as they turned to walk into the station, Mr. Timko "was standing there, gun in hand, and his finger on the trigger"; he then "began to get loud," "told [them] he would handle it," and "basically chased [them] out of the building." Doc. 28-1 at 7 (Ex. 4). Another incident allegedly took place on June 29, 2012, when Mr. Timko was directing traffic in the midst of "a bad downpour in town"; according to a bystander, as one Dillonvale resident "tr[ied] to go through the water," Mr. Timko "start[ed] yelling and calling [the resident] an a—hole and other obscenities." *Id.* at 10 (Ex. 7). Plaintiff finally points to the facts behind the Bikoski case. According to the complaint, Mr. Timko and Officer Watson, another Dillonvale officer, would "routinely spend long periods of time" "socializing" with one of Mr. Bikoski's neighbors while on duty. *Bikoski*, No. 13-467, doc. 2 ¶ 9. When Mr. Bikoski chastised Officer Watson for socializing with his neighbor instead of doing his job, Officer Watson assaulted and arrested him, and Mr. Timko participated in the decision to press charges against him. *See id.* ¶¶ 11–23.[5]

With these examples, Plaintiff argues for municipal liability "on the basis of an inaction theory." *Thomas*, 398 F.3d at 429 (internal quotation marks omitted). This fits into the fourth category of *Monell* liability listed above—"an unwritten policy, practice, or custom of

---

[5] Mr. Timko submits a joint motion *in limine* and motion to strike. Doc. 37. The motion to strike pertains to exhibits that relate to Mr. Timko's prior D.U.I. offenses and to these other controversies between different Dillonvale residents and Mr. Timko. Mr. Timko argues that the rules of evidence exclude the exhibits, *see* Fed. R. Evid. 401; Fed. R. Evid. 402, and Plaintiff counters that the exhibits bear relevance to her *Monell* claim. For the reasons explained within, the Court resolves the motion for summary judgment as to Plaintiff's *Monell* claim in Dillonvale's favor—even assuming the contested exhibits are properly before the Court at this stage. Mr. Timko's motion to strike is thus denied as moot. (This logic extends to Dillonvale's motion regarding the deposition of assistant Jefferson County prosecutor Jeff Bruzzesse's deposition testimony, *see* doc. 41, to the extent his testimony is relevant to the *Monell* claim.) The Court also need not decide at this juncture Mr. Timko's simultaneous motion *in limine* to exclude the exhibits at trial; it is thus denied without prejudice. Should this case progress to trial, Mr. Timko would be free to file a corresponding motion *in limine*.

condoning" the conduct at issue in this case. *Id.* According to Plaintiff, Dillonvale never investigated these issues nor disciplined Mr. Timko for them. As she sees it, this is enough to render Dillonvale liable for a policy of acquiescence to Mr. Timko's unconstitutional "intru[sions] upon the lives of [Dillonvale's] citizens." Doc. 39 at 2. Dillonvale counters that at least some of these incidents occurred after the incident with Plaintiff, meaning that the incidents could not have put Dillonvale on notice. The Village also argues that the events before the conduct at issue—Mr. Timko's D.U.I. violations, for example—do not relate to the alleged violations, and do not evidence the Village's approval of any kind of unconstitutional conduct.

Turning to the guiding precedent from the Sixth Circuit, a plaintiff must show four elements in order to make a prima facie *Monell* claim under the inaction theory: (1) a "clear and persistent pattern of" unconstitutional actions on the part of Dillonvale Police Department employees; (2) "notice or constructive notice on the part of" the Village; (3) Dillonvale's "tacit approval of the unconstitutional conduct, such that [the Village's] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) that this policy of inaction was the "direct causal link in the constitutional deprivation." *Doe*, 103 F.3d at 508; *see Thomas*, 398 F.3d at 429. Viewing the facts in Plaintiff's favor, and with no genuine issues of material fact as to the four elements at issue, the Court finds that Plaintiff's *Monell* claim fails under the inaction theory as a matter of law. Even assuming she can meet the fourth element, Plaintiff cannot show a prima facie claim as to the first three elements.

First, Plaintiff fails to present evidence that rises to the level of a "clear and consistent pattern" of related unconstitutional conduct. *Doe*, 103 F.3d at 508. She points to one incident— Mr. Timko's alleged run in with a Dillonvale citizen in traffic—that happened two years later. However, "subsequent conduct cannot establish a pattern of violations that would provide

"notice to the cit[y] and the opportunity to conform to constitutional dictates," *Connick v. Thompson*, __ U.S. __, __ n.7, 131 S. Ct. 1350, 1360 n.7 (2011) (alteration in original) (internal quotation marks omitted); she thus cannot use this alleged conduct to support her *Monell* claim. Plaintiff also attempts to rely on Dillonvale's handling of Mr. Timko's D.U.I. violations, but these also cannot help Plaintiff in meeting her prima facie burden under this theory of *Monell* liability. Mr. Timko did not violate anyone else's constitutional rights with his D.U.I. violations; even if he did, they would not be the kind of "*similar* constitutional violations" necessary to establish a pattern to put the Village on notice. *See, e.g.*, *D'Ambrosio v. Marino*, __ F.3d __, __, No. 13-3118, 2014 WL 1243792, at *7 (6th Cir. Mar. 27, 2014) (emphasis added).

Second, this leaves one incident where Mr. Timko allegedly intimidated two Dillonvale citizens roughly a month before the facts of this case took place. However, "attempting to infer a municipal-wide policy based solely on one instance of potential misconduct" is a "path to municipal liability [that] has been forbidden by the Supreme Court." *Thomas*, 398 F.3d at 433; *see D'Ambrosio*, 2014 WL 1243792, at *7 ("For the *Connick* Court, *four prior Brady violations over the course of a decade were not enough to place the prosecutor's office on notice* that any sort of action was necessary in order to avoid the *Brady* violations at issue in *Connick*." (emphasis added)); *Thomas*, 398 F.3d at 432–33 ("This argument, taken to its logical end, would [collapose] the municipal liability standard into a simple *respondeat superior* standard.").

Third, Plaintiff fails to meet the deliberate-indifference standard necessary under the third prong of *Doe*. The Sixth Circuit has reiterated that "deliberate indifference" "does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference" to the employee's actions at issue. *Doe*, 103 F.3d at 508. To this end, Plaintiff presents no evidence that the Village actually knew or should have known that Mr.

Timko had violated or would violate again a citizen's rights in the manner that he allegedly violated Plaintiff's. The D.U.I.s would not have put the Village on notice that Mr. Timko would arrest Plaintiff or allegedly aid in her prosecution in the manner in which he did. Nor would the events with Mr. Bikoski that came years later. This again leaves one incident, from one month earlier, involving different citizens under different circumstances with a different outcome. In short, Plaintiff's claim again fails, as she "cannot rely solely on a single instance to infer a policy of deliberate indifference." 398 F.3d at 433.

### 2. Failure to Train or Supervise

Plaintiff must make a prima facie showing of three elements to survive summary judgment on her failure-to-train claim under *Monell*: (1) Dillonvale's "training program was inadequate for the tasks that officers must perform"; (2) "the inadequacy was the result of the City's deliberate indifference; and [(3)] the inadequacy was closely related to or actually caused the injury." *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006). Plaintiff contends that Dillonvale's failure to train or supervise Mr. Timko in any way led to the deprivation of her constitutional rights as they pertained to her arrest and her prosecution. Dillonvale counters by pointing to places in the record that indicate that Mr. Timko had indeed received training both prior to his tenure, *see* doc. 27-3 at 11–12 (certificates of completion for the Eastern Ohio Law Enforce Academy and Ohio's Peace Officer Basic Training Program), and during his tenure as a Dillonvale officer, *see id.* at 13 (certificate showing Mr. Timko's completion of an "advanced training course" for his "Criminal Procedure Update" on January 21, 2010).

The Court finds that no genuine issue of material fact exists as to Plaintiff's failure-to-train claim, and that her claim under this path fails as a matter of law. The same deliberate-indifference problems explained in the context of her policy-of-inaction claim apply under this

theory as well.  The record demonstrates that Mr. Timko participated in training programs—both general and regarding criminal procedure—before and during his time as a Dillonvale officer. As the Supreme Court explained in *City of Canton v. Harris*, a plaintiff may not simply argue that the injury at issue "could have been avoided if an officer had better or more training."  489 U.S. 378, 391 (1989).  In other words, "[t]he simple fact" that Mr. Timko had received pre-job and during-the-job training on a host of issues, including criminal procedure, "seems to obviate the plaintiff's [failure-to-train] argument."  *Mayo v. Macomb Cnty.*, 183 F.3d 554, 558 (6th Cir. 1999).  Even if it did not, Plaintiff would still have to show that Dillonvale's failure to provide *better* training rose to the level of "deliberate indifference to the rights of its inhabitants."  *City of Canton*, 489 U.S. at 389.  And again, this sort of deliberate indifference only arises "where the need for more or different training is . . . obvious."  *Id.* at 390.  Plaintiff fails to provide an explanation as to how the training provided was so inadequate that it would obviously lead to constitutional violations of the sort that allegedly took place in this case.  Further, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Connick*, __ U.S. at __, 131 S. Ct. at 1360.  For the reasons explained, none of the incidents on which Plaintiff could rely suffices to demonstrate a "pattern" of conduct necessary to succeed on this kind of *Monell* claim.

### 3. Final Decision-Making Authority

Contrary to the other theories, "a plaintiff would not need to establish a pattern of past misconduct where the actor was a policymaker with final policymaking authority."  *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013); *see id.* (referring to this avenue of liability as "a single-act theory").  The Supreme Court established the final decision-maker path for *Monell* liability in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).  According to this theory, the

single action of a final policymaker could render a municipality liable provided several requirements are met. There must be: (1) "a deliberate choice to follow a course of action . . . made from among various alternatives," and (2) the choice must be made by "the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483

The parties disagree about whether Mr. Timko can be considered a final policymaker as to the two incidents that led to the violations in question: Plaintiff's arrest and her prosecution. The Court looks to state law to resolve their dispute, specifically "[t]o determine whether final authority to make municipal policy [was] vested in" Mr. Timko. *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). State law includes "statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom." *Id.* For Dillonvale to be liable, the statutes, ordinances, regulations, or customs would have to establish Mr. Timko's decisions as to arrest and prosecution "final and unreviewable" and "not constrained by the official policies of superior officials." *Id.* (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion)).

### a. The Arrest

Starting with her arrest, Plaintiff's *Monell* single-act claim appears at first glance to meet the contours of *Pembaur* and its progeny. First, when viewed in Plaintiff's favor, the record demonstrates that Mr. Timko acted not as an officer, but as the Dillonvale Chief of Police during the course of the investigation and arrest that day. To be sure, Mr. Timko arrived on the scene of the incident in a Smithfield car. See doc. 27-1 at 139–40. Soon after, however, he announced to the other officers that, "because [he] was the chief [in Dillonvale]," he was "tak[ing] over control of the scene." *Id.* at 140. Several of the other officers present at the scene confirm as much.

Officer Thomas testified that Mr. Timko went "off duty" with Smithfield and switched to "on duty with Dillonvale" before they conducted a search of the house. Doc. 26-5 at 32. Officer Christian testified that Mr. Timko "communicated to [him]" that "he was taking over the scene as Chief of Police in Dillonvale." Doc. 26-3 at 111.

Second, the record viewed in her favor also demonstrates that Mr. Timko, to the extent he acted as Dillonvale Chief of Police, acted with authority that was "final and unreviewable." *Feliciano*, 988 F.2d at 655 (citing *Praprotnik*, 485 U.S. at 127 (plurality opinion)). To be sure, he testified that he eventually resigned in part because of the mayor's belief "that she ran the police department." Doc. 27-1 at 69. But he also testified that he clashed with the mayor over his belief that he, by himself, ran "the day-to-day operations and practices of the police department." *Id.* at 68. Further, when asked whether the mayor and city council acted as his supervisors, he responded in relevant part, "To the best of my understanding, I'm the department head, I run the department." *Id.* at 67. Based on this testimony, and without any other statutes or ordinances on the record, a reasonable jury could find that Mr. Timko generally served as the final policymaker for the Dillonvale police department.

This, however, does not end the matter. The *Pembaur* Court provided a carve-out to a situation that ostensibly meets its requirements but still would not render a municipality liable. As the Court "emphasize[d]," "not every decision by municipal officers automatically subjects the municipality to § 1983 liability." 475 U.S. at 481. It specifically warned against a type of *Monell* liability that would amount to "an application of the theory of *respondeat superior.*" *Id.* at 483. In other words: "The fact that a particular official—even a policymaking official—*has discretion in the exercise of particular functions* does not, without more, give rise to municipal liability based on an exercise of that discretion." *Id.* at 481–82 (emphasis added). The Sixth

Circuit has taken this to mean that a policymaker's actions can only render a municipality liable where that policymaker "was acting in a policymaking capacity when he" allegedly violated a citizen's constitutional rights. *Wooten v. Logan*, 92 F. App'x 143, 147 (6th Cir. 2004).

The Court finds that the *respondeat superior* exception applies here, and that Mr. Timko did not act in a policymaking capacity when he arrested Plaintiff. The Sixth Circuit case of *Wooten v. Logan* compels this conclusion. There, a Tennessee sheriff stopped a car while using a county cruiser and, while in uniform, proceeded to detain and rape one of the car's passengers, a woman with mental disabilities. *See* 92 F. App'x 143, 146. The Sixth Circuit held that his actions did not render the county liable, primarily because the plaintiff did not show that the sheriff "was acting in a policymaking capacity when he detained and assaulted" the passenger. *Id.* For this reason, the sheriff's "conduct [could] not conceivably be characterized as exercising a power to set policy." *Id.* Applied here, the Court finds as a matter of law that Mr. Timko cannot be said to have acted in a policymaking capacity when he arrested Plaintiff outside of her house. Mr. Timko performed a common police action that any other police officer present at the scene could have performed. That he did so while also serving simultaneously fulfilling the role as Chief of Police in Dillonvale cannot render the Village liable. Holding otherwise would open up towns and small municipalities to liability for a host of run-of-the-mill actions of their police officers—police officers that serve as both Chief of Police and the officer on patrol because of budgetary constraints or, more likely, the size of the municipality. The Sixth Circuit confirmed as much in *Wooten*, and the court's words from that case apply with equal force here:

> [Plaintiff] can state a claim against the [Village] only if 'law enforcement' activity (*e.g.*, stop, arrest, etc.) by a sheriff (or *other chief law enforcement official*)—whether a matter of official business or a misuse of power to advance a private agenda—represents the 'official policy' of the local government.

*Wooten*, 92 F. App'x at 147 (emphasis added).  Holding otherwise would also allow for *respondeat superior* liability in the context of *Monell* claims, thus "contravene[ing] *Pembaur*'s attempt "to distinguish acts of the *municipality* from acts of *employees* of the municipality."  *Id.* (quoting *Pembaur*, 475 U.S. at 469 (emphasis in original)).

Plaintiff's counterargument does not persuade the Court otherwise.  She points to several cases to support the general proposition that the actions of police chiefs, sheriffs, and other policymaking law-enforcement officials can amount to liability for a municipality.  While true, none of these cases squarely addressed the facts at issue here, where a police officer—who happens to be the police chief—performed a common police action that ultimately led to the alleged violation of rights.  *See Arendale v. City of Memphis*, 519 F.3d 587, 602 (6th Cir. 2008) (allowing for *Monell* liability where, unlike here, a "subordinate official" made an "allegedly unconstitutional decision" and the police chief "with final authority over [the] matter" affirmed that decision on appeal); *Monistere v. City of Memphis*, 115 F. App'x 845, 852 (6th Cir. 2004) (affirming *Monell* liability where the city operated under an "unwritten" policy that allowed a "lead investigator to have full control over the conduct of an investigation"); *Heflin v. Stewart Cnty.*, 958 F.2d 709, 716 (6th Cir. 1992) (upholding denial of a motion for directed verdict where the sheriff at issue "did nothing other than follow the [county's] policy or custom" that led to the violation of a constitutional right).  *Wooten*, by contrast, directly addressed the facts at issue here.  It thus controls, and Plaintiff's *Monell* claim as to her arrest fails.

### b. The Prosecution

Plaintiff also claims that Mr. Timko acted as a final policymaker during the process that led to her prosecution.  She specifically contends that Mr. Timko's insistence that the assistant

Jefferson County prosecutor press charges renders Dillonvale liable under *Monell*.  The Court finds that this claim also fails as a matter of law.

Viewing record evidence in her favor does not lead to a reasonable inference that Mr. Timko was the final policymaker when it came to prosecutions in Jefferson County.  Based on assistant Jefferson County prosecutor Jeff Bruzzesse's deposition testimony, Plaintiff can at best argue that that Mr. Timko's participation in the prosecutorial process "[v]ery much" "*influenced*" the decision to press charges.  Doc. 39-2 at 22–23 (emphasis added).  But even if his involvement in the process influenced the decision to prosecute, Mr. Timko—a police officer, and not the Jefferson County prosecutor or an assistant Jefferson County prosecutor—did not have the final and unreviewable say as to whether or not to prosecute Plaintiff.  Plaintiff does not, and could not, cotend otherwise.  Ohio statutory law confirms that prosecutorial policies rest with a given municipality's prosecuting attorney (and assistant prosecuting attorneys), not police officers.  *See* Ohio Rev. Code § 309.08(A) ("The prosecuting attorney shall prosecute, on behalf of the state, all complaints, suits, and controversies in which the state is a party . . . ."); *see also State ex rel. Master v. Cleveland*, 75 Ohio St. 3d 23, 27, 661 N.E.2d 180, 184 (Ohio 1996) ("A prosecuting attorney will not be compelled to prosecute a complaint except when the failure to prosecute constitutes an abuse of discretion.  Therefore, the decision whether to prosecute is discretionary, and not generally subject to judicial review." (citations omitted)).  For these reasons, Plaintiff's *Monell* single-act claim as to her prosecution fails as a matter of law.

## IV. REMAINING MOTIONS

Mr. Timko moves for judgment on the pleadings as to any claims asserted against him in his official capacity as an employee or agent of Smithfield.  He argues that these claims were dismissed when the parties stipulated to the dismissal of Smithfield as a defendant in this case.

*See* doc. 33. In response, Plaintiff clarifies that she does not bring an official-capacity claim against Mr. Timko on any front, and explains that she referred to Mr. Timko as an agent of Smithfield in her pleadings in order to address the color-of-law requirement under section 1983. *See, e.g.*, *Med Corp. v. City of Lima*, 296 F.3d 404, 417 (6th Cir. 2002); *cf.* doc. 2 ¶ 4 (Plaintiff's complaint, noting that she is suing Mr. Timko "in his individual capacity"). Mr. Timko's motion on this count is thus denied as moot. Dillonvale also submits a motion to strike the deposition testimony of Jefferson County Assistant Prosecutor Jeffrey Bruzzese. Doc. 41. The deposition pertains, at least in part, to Plaintiff's malicious prosecution claim and whether Mr. Timko had a hand in the decision to prosecute Plaintiff. *See Sykes*, 625 F.3d at 308. Again, the Court decided Plaintiff's motion without having to refer to the deposition, and Dillonvale's motion to strike is thus also denied as moot.

## VI. CONCLUSION

For the reasons stated, Plaintiff's motion for partial summary judgment, doc. 28, is **DENIED**; and Dillonvale's motion for summary judgment as to Plaintiff's *Monell* claim, doc. 31, is **GRANTED**. The following motions are also **DENIED as moot**: Smithfield's motion for summary judgment on Plaintiff's *Monell* claim, doc. 32; Mr. Timko's simultaneous motion to strike and motion *in limine*, doc. 37; Dillonvale's motion to strike, doc. 41; and Mr. Timko's motion for judgment on the pleadings, doc. 43.

**IT IS SO ORDERED.**

5-13-2014

**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**